## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DANNY R. CANTRELL,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00021 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:  PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, Danny R. Cantrell, ("Cantrell"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cantrell protectively filed his application for DIB on May 8, 2019, alleging disability as of March 11, 2019, based on diabetes; elevated blood pressure; herniated discs in the neck and spine, causing hand swelling and numbness, as well as numbness and pain in both thumbs; and stage two prostate cancer, resulting in bladder issues. (Record, ("R."), at 132-33, 156, 185, 200.) The claim was denied initially and upon reconsideration. (R. at 77-78, 83, 85-86.) Cantrell then requested a hearing before an administrative law judge, ("ALJ"). (R. at 89-90.) The ALJ held a hearing on October 2, 2020, at which Cantrell was represented by counsel. (R. at 32-61.)

By decision dated October 16, 2020, the ALJ denied Cantrell's claim. (R. at 19-27.) The ALJ found Cantrell met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2020.[2] (R. at 21.) The ALJ found Cantrell had not engaged in substantial gainful activity at any time from March 11, 2019, the alleged onset date, through June 30, 2020, the date last insured. (R. at 21.) The ALJ determined that, through the date last insured, Cantrell had severe impairments, namely degenerative disc disease of the cervical spine; residuals of prostate cancer with urinary incontinence; obesity; diabetes; and hypertension, but he found Cantrell did not have an impairment or combination of impairments that met or medically

---

[2] Therefore, Cantrell must show he was disabled between March 11, 2019, the alleged onset date, and June 30, 2020, the date last insured, to be eligible for DIB benefits.

equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.) The ALJ found that, through the date last insured, Cantrell had the residual functional capacity to perform medium work,[3] except he could have no exposure to unprotected heights and only occasional exposure to vibrations. (R. at 23.) The ALJ found Cantrell could perform his past relevant work as a restaurant manager, a cook and a kitchen helper. (R. at 27.) Thus, the ALJ concluded Cantrell was not under a disability as defined by the Act at any time from March 11, 2019, the alleged onset date, through June 30, 2020, the date last insured, and he was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(f) (2021).

After the ALJ issued his decision, Cantrell pursued his administrative appeals, (R. at 127-28, 227-29), but the Appeals Council denied his request for review. (R. at 5-9.) Cantrell then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Cantrell's motion for summary judgment filed October 6, 2021, and the Commissioner's motion for summary judgment filed November 4, 2021.

## II. Facts

Cantrell was born in 1954, (R. at 132), which classifies him as a "person closely approaching retirement age" under 20 C.F.R. § 404.1563(e). He has a high school education and past work experience as a restaurant manager, a cook and a kitchen helper. (R. at 40, 55, 157.) Cantrell testified he was 66 years old, he was 5

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2021).

feet 7 inches tall, and he weighed between 190 and 195 pounds at the time of the hearing. (R. at 40.) He said he and his wife owned a drive-in restaurant from 1978 to 2019, when they sold it and retired. (R. at 40-42.) Cantrell testified he had taken his Social Security retirement benefits. (R. at 42.) He stated this job required him to perform many job duties, which he was unable to do after undergoing a prostatectomy and radiation treatments for prostate cancer. (R. at 40-41, 47.) According to Cantrell, the radiation damaged both his bladder and his colon, resulting in daily urinary leakage, as well as daily bouts of diarrhea. (R. at 43-44.) Specifically, he stated the damage to his bladder caused him to need to urinate at least hourly, and the radiation bruised his colon, which caused him to have at least six to eight bouts of diarrhea in an eight-hour period. (R. at 43-44.)

Cantrell also testified that he had neck problems dating back to 2004, for which surgery was recommended. (R. at 42.) He stated that, following the radiation treatments in 2016, he was unable to lift his right arm at all, and he had numbness down to his thumbs. (R. at 47.) Although his oncologist initially suspected his cancer might have metastasized, a neurosurgeon told him he had fairly significant cord compression in the cervical spine, for which surgery was recommended. (R. at 48.) However, Cantrell testified he underwent an unsuccessful course of physical therapy, as he did not want the surgery at that time. (R. at 48.) He stated he took only over-the-counter pain medications and used a heating pad several times daily for his neck and shoulder pain. (R. at 54.) Although Cantrell stated that, since 2017, he spent most of his day just trying to relax and reclining a lot, he also stated he tried to get up and move for about five to 10 minutes at a time to keep his body mobile. (R. at 50, 54.)

Cantrell testified that during the time he was undergoing treatments, he worked only a few hours a couple of days weekly, and he never worked more than 15 or 16 hours a week after he completed radiation treatments. (R. at 48-49.) He testified he could not work then because he was exhausted, and the radiation made his diabetes uncontrollable, for which he recently was placed on insulin. (R. at 50.) He said he could not be on his feet much more than 10 minutes at a time, he still could not lift his right arm above his shoulder, and he continued to have numbness from his shoulder to his hand, as well as right thumb pain. (R. at 51.) Cantrell testified he could not grip anything up to head level with his right arm due to pain. (R. at 51.) He said he could reach overhead with his left arm and hand; however, he said he had left thumb numbness and pain, which affected his ability to grip objects. (R. at 52.) Cantrell testified he could use his hands, repetitively, out in front of him at chest level for five minutes. (R. at 53.) He said when he lifted and carried objects, he used only the fingers of both hands, not his thumbs. (R. at 53.) Cantrell testified he did not have a lot of energy most of the time, and he stated his nephew had mowed his lawn since 2015 or 2016. (R. at 41, 53.) He also said that lifting and carrying or bending over caused him to have "a lot" of urine leakage. (R. at 54.) According to Cantrell, he continued to have to use the restroom at least hourly. (R. at 54-55.) Although his prostate cancer currently was in remission, he stated he wore a Depend undergarment most of the time due to urinary issues resulting from his cancer. (R. at 42.)

In Function Reports, completed in June and October 2019, Cantrell indicated he worked daily around the house, helped care for the family cats, made sandwiches once or twice weekly, mowed the yard, drove independently, shopped in stores, attended family gatherings, attended church services, and he had no problem with personal care. (R. at 166-69, 192-94.) In June 2019, he listed farming as a hobby,

which he did weekly and moderately well, but by October 2019, he said he no longer could farm or attend social events due to fear of using the bathroom on himself. (R. at 169, 195.) Also in October 2019, Cantrell estimated he could walk 100 yards before needing to stop and rest for five to 10 minutes. (R. at 196.)

Rick Bradley, a vocational expert, also was present and testified at Cantrell's hearing. (R. at 55-59.) He classified Cantrell's past relevant work as a composite job, consisting of the following three occupations: a restaurant manager, which is light[4] and skilled; a cook, which is medium and skilled; and a kitchen helper, which is medium and unskilled. (R. at 55.) Bradley testified that a hypothetical individual of the same age, education and work history as Cantrell, who could perform medium work, except he could not work at unprotected heights, and he could have no more than occasional exposure to vibrations or vibrating surfaces, could perform all three of the jobs listed above. (R. at 56.) Bradley next testified that the same hypothetical individual, but who was restricted to the performance of light work, could perform the restaurant manager job. (R. at 56-57.) Next, Bradley testified that the same individual as in the second hypothetical, but who could use the right arm for lifting and carrying less than 10 pounds and performing no reaching could not perform the restaurant manager job. (R. at 58.) Lastly, Bradley testified that if an individual could not use both upper extremities more than occasionally for handling, fingering, manipulating and reaching, the restaurant manager job would be eliminated. (R. at 59.)

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

In rendering his decision, the ALJ reviewed records from Highlands Pathology Consultants, P.C.; Dr. Scott Coen, M.D.; Wellmont Health System; Urology Associates of Kingsport; Wellmont Southwest Virginia Cancer Center; Dr. Maurice E. Nida, D.O.; Wellmont Medical Associates; Dr. Wendy Abbott, D.O.; Wellmont Lonesome Pine Hospital; Dr. Patricia A. Radich, D.O.; Ballad Health Medical Associates Primary Care Norton; Blue Ridge Neuroscience Center; Wellmont Holston Valley Medical Center; Dr. James R. Herman, M.D.; Pikeville Medical Center; Dr. Daniel Camden, M.D., a state agency physician; and Dr. Bert Spetzler, M.D., a state agency physician.

As noted above, the relevant time period for this court's consideration is a very narrow one – from March 11, 2019, to June 30, 2020. However, the court finds that some of Cantrell's treatment records from outside of this time period are relevant to a complete understanding of his claim. For instance, the record shows that Cantrell saw Dr. Paul C. Peterson, M.D., at Blue Ridge Neuroscience Center, on December 10, 2004, for an evaluation of cervical pain and right upper extremity pain not precipitated by an accident or injury. (R. at 454.) An October 5, 2004, MRI showed disc degeneration and central disc protrusions lateralizing to the right at the C4-C5 and C5-C6 levels. (R. at 456.) A physical examination revealed mild paraspinal muscle contractions and cervical spine tenderness. (R. at 455.) Dr. Peterson prescribed medications and scheduled a course of physical therapy. (R. at 457.)

In May 2015, Cantrell was diagnosed with prostate cancer, for which he underwent surgery, radiation treatments and a short course of hormone suppression therapy, ("HST"). (R. at 230, 535.) On August 10, 2015, Cantrell underwent a robot-assisted laparoscopic radical prostatectomy by Dr. James R. Herman, M.D., without complication. (R. at 570-76.) At a post-operative visit with Dr. Herman on August

25, 2015, he noted Cantrell had a history of hypertension and noninsulin dependent diabetes, both of which were stable. (R. at 552.) He also noted Cantrell was doing well with excellent urinary control. (R. at 557.) By October 1, 2015, Cantrell's urinary control essentially was back to normal. (R. at 544.) Cantrell saw Dr. Scott Coen, M.D., a radiation oncologist, for a consultation on December 17, 2015. (R. at 429-33.) He reported occasional hot flashes since receiving an Eligard injection, as well as having to use the restroom once during the night and occasional stress incontinence. (R. at 431.) Cantrell also reported bilateral joint pain in his knees since receiving the Eligard and beginning HST. (R. at 431.) Nonetheless, a physical examination was completely normal. (R. at 432.) Dr. Coen recommended a course of radiation therapy, and Cantrell underwent 33 radiation treatments from February 16, 2016, through April 1, 2016. (R. at 381-426, 433.) A nuclear medicine whole body bone scan, dated February 19, 2016, showed no evidence of metastatic disease. (R. at 232.)

Cantrell continued to have regular follow ups with Dr. Herman through December 2017 and with Dr. Coen through February 2019. By October 12, 2016, Cantrell advised Dr. Herman he had returned to all activities of daily living. (R. at 498.) The following month, Cantrell reported progressively worsening neck pain over the prior two months, initially radiating into the right shoulder, then to the left. (R. at 368.) Dr. Coen ordered an MRI of the cervical and upper thoracic spine, which showed no evidence of metastatic disease in the cervical region. (R. at 368, 460.) This MRI did, however, show a central extrusion at that C4-C5 level with prominent cord compression, at least moderate in degree, with bilateral foraminal stenosis; a broad-based disc protrusion on the left at the C5-C6 level with mild cord compression; and potential ossification of the posterior longitudinal ligament at the C4 and C5 discs. (R. at 460.) In December 2016, Dr. Ken Smith, M.D., a

neurosurgeon at Blue Ridge Neuroscience Center reviewed these MRI results and recommended surgical intervention. (R. at 460.) Dr. Smith stated that Cantrell could continue his employment as a restaurant manager. (R. at 461.)

In February 2017, Cantrell complained of hot flashes, occasional diarrhea, occasional dribbling, mild painful urination and having to use the restroom up to once during the night. (R. at 491.) Dr. Herman noted Cantrell's most recent PSA results were less than 0.01. (R. at 493.) That same month, a physical examination performed by Dr. Coen was normal, and Cantrell's performance status was deemed "fully active," meaning he was able to carry on all predisease performance without restriction. (R. at 358.) By June 2017, Cantrell reported the hot flashes had become less intense over time, but he continued to report occasional dribbling and having to use the restroom up to once during the night. (R. at 484.) Dr. Herman found Cantrell was doing well, aside from the hot flashes. (R. at 488.) In August 2017, Cantrell reported continued neck pain to Dr. Coen, but he said weekly acupuncture was providing good relief. (R. at 353.) Physical examination, again, was normal. (R. at 354.) In December 2017, Cantrell reported occasional dribbling, having to use the restroom up to once during the night, occasional urgency and occasional urgency incontinence. (R. at 474.) However, he stated that, overall, he was doing well, and he continued to work and farm. (R. at 474.) Dr. Herman noted there was no evidence of disease with regard to Cantrell's prostate cancer. (R. at 478.) In February 2018, Cantrell reported he continued to undergo acupuncture treatment for his neck every 10 days with good results. (R. at 349.) Physical examination was normal, and Dr. Coen noted Cantrell's PSA score had "zeroed out." (R. at 350.) Dr. Coen advised Cantrell he did not need to return for one year. (R. at 350.) When he did, in February 2019, he saw Rachael Leigh Carter, N.P., a nurse practitioner. (R. at 252, 345.) Carter noted Cantrell's PSA continued to be nearly zero three years status-post

radiation. (R. at 252, 345.) Cantrell denied any complaints, and his physical examination was normal. (R. at 253, 345-46.) Cantrell's performance status was, again, described as fully active. (R. at 253, 346.) Carter noted acupuncture was continuing to provide good results for Cantrell's neck pain. (R. at 253, 346.) She advised him to return to the clinic on an as-needed basis and to continue to obtain PSA testing from his primary care provider. (R. at 253, 346.)

On April 1, 2019, Cantrell saw Dr. Fredia Helbert, Au.D., an audiologist, at Mountain Empire Hearing & Balance, with complaints of difficulty hearing conversations, especially in noisy environments. (R. at 233.) He denied pain, drainage, tinnitus and vertigo. (R. at 233.) Testing revealed a mild to moderately severe sensorineural hearing loss, bilaterally. (R. at 233.)

Cantrell saw his primary care provider, Dr. Maurice E. Nida, D.O., and Dr. Amanda E. Herrell, D.O., a resident, on June 7, 2019, for a routine follow up. (R. at 303.) Dr. Herrell noted Cantrell's hypertension and diabetes were controlled, but his untreated hyperlipidemia was not. (R. at 303.) She noted that Cantrell's weight was stable, and he followed a generally healthy diet. (R. at 303.) Cantrell reported exercising daily, and he reported blood glucose levels ranging from 110 to 130. (R. at 303.) Cantrell's medications included Norvasc, Coreg, metformin, Prilosec, Diovan and glipizide. (R. at 303.) He denied diarrhea, pain with urination, blood in his urine, urgency and musculoskeletal symptoms, among other things. (R. at 304.) Cantrell's blood pressure was 110/82. (R. at 304.) A physical examination was completely normal, including a normal range of motion of the neck, as well as a normal musculoskeletal range of motion. (R. at 304-05.) Although Cantrell's diabetes was controlled, Dr. Herrell noted his recent A1C was 7.6, which needed to be closer to 7. (R. at 306.) Thus, she discontinued glipizide and initiated Jardiance.

(R. at 305-06.) Dr. Herrell also prescribed Lipitor for Cantrell's hyperlipidemia. (R. at 305.) She continued Cantrell's other medications and ordered appropriate labs. (R. at 305-06.)

Cantrell saw Dr. Jim R. Littlejohn, M.D., at Urology Associates of Kingsport, on June 18, 2019, for a routine follow up. (R. at 469.) Dr. Littlejohn noted Cantrell's PSA scores had been low since his prostate cancer treatment was started. (R. at 469.) Cantrell endorsed problems with erectile dysfunction, but he denied urinary incontinence, an abnormal sensation when needing to urinate or needing to strain or bear down to start his urinary stream, and he reported normal bowel functioning. (R. at 469.) Cantrell indicated experiencing hot flashes and night sweats, numbness and tingling, diabetes, diarrhea, trouble swallowing and high blood pressure, but he denied fatigue, hearing problems and musculoskeletal problems. (R. at 470.) His blood pressure was 142/81. (R. at 470.) Dr. Littlejohn indicated that Cantrell's June 3, 2019, PSA score was "undetectable." (R. at 471.) He diagnosed Cantrell with a history of prostate cancer and erectile dysfunction. (R. at 471.) He discontinued glipizide, he instructed Cantrell to have PSA testing in six months, and he instructed him to return in one year. (R. at 471.)

Cantrell saw Dr. Wendy Abbott, D.O., for a consultative examination on July 20, 2019, at the request of Disability Determination Services. (R. at 327-30.) He advised he was filing for disability due to side effects of prostate cancer treatment, including unpredictable, recurrent diarrhea; hearing problems in the left ear; and urinary incontinence. (R. at 327.) Cantrell said the diarrhea interfered with daily life activities, he often could not tell when he needed to urinate, and he could not lift anything or exert any abdominal pressure without urinating uncontrollably. (R. at 327.) He said these side effects had significantly worsened since their onset, and he

did not think he could tolerate a full day's work, as he could not physically lift any significant weight without urinating uncontrollably, he could not distinguish single voices or instructions in a noisy environment, and he could not control when he had diarrhea. (R. at 327.) Cantrell stated he had to stop working as a restaurant manager after 42 years because these side effects interfered with his ability to perform his job. (R. at 327.)

In a Review of Symptoms, Cantrell endorsed night sweats, chronic hearing loss, vertigo, nose bleeds, loss of smell, difficulty swallowing, diarrhea, urgency, frequency, having to use the restroom during the night, thirst, rash and itching. (R. at 327-28.) His blood pressure was 139/82. (R. at 328.) On physical examination, Cantrell was in no acute distress; he had a normal gait, and he ambulated without assistance; he exhibited no neck tenderness; he had strong neck movement against resistance and strong shoulder shrug; he had active bowel sounds without bruits or peristaltic rushes; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; there was no edema, cyanosis or erythema of the extremities; hearing was intact, bilaterally, to whisper; he had good muscle tone and full strength in all muscle groups, bilaterally; he had no abnormal reflexes; he had intact sensation throughout; there was no muscle asymmetry, atrophy or involuntary movements; there was no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint; straight leg raise testing was negative; and range of motion was normal in all joints tested, including the cervical spine and shoulders. (R. at 328-30.)

Dr. Abbott diagnosed Cantrell with diarrhea, urinary incontinence (likely stress incontinence), and inability to detect sounds while in a noisy environment, all likely due to side effects of prostate cancer treatment. (R. at 329.) She recommended

further evaluation of his hearing by an ENT. (R. at 329.) Dr. Abbott noted Cantrell could sit in no significant distress, walk and stand in the office. (R. at 329.) She found it unlikely he could walk and/or stand for a full workday, but he may be able to sit for a partial workday with allotted occasional breaks every 30 minutes. (R. at 329.) Dr. Abbott further found Cantrell should be limited to lifting/carrying less than five pounds because his condition may be exacerbated by lifting or carrying excessive weight. (R. at 329.) In particular, she noted that he should be so limited as to avoid uncontrolled urination. (R. at 329.) Dr. Abbott also found Cantrell should refrain from excessive bending, stooping and crouching. (R. at 329.)

On August 5, 2019, Dr. Daniel Camden, M.D., a state agency physician, completed a Physical Residual Functional Capacity assessment of Cantrell, finding he could occasionally lift and/or carry 20 pounds occasionally and 10 pounds frequently; he could stand and/or walk a total of six hours in an eight-hour workday; he could sit a total of six hours in an eight-hour workday; he had an unlimited ability to push and/or pull with the upper and lower extremities; he had an unlimited ability to balance; he could frequently climb ramps and stairs, stoop, kneel, crouch and crawl; he could occasionally climb ladders, ropes or scaffolds; he had no manipulative, visual or communicative limitations; and he should avoid concentrated exposure to noise and vibration. (R. at 65-66.) Dr. Camden noted he was basing his findings on Cantrell's history of prostate cancer, his reports of an inability to hear in a noisy environment and his cervical spine compressions with neck pain. (R. at 65-66.)

Cantrell saw Dr. Nida and Dr. Teresa B. Landore, D.O., a resident, on September 6, 2019, for a routine follow up. (R. at 338.) He noted that, since beginning Jardiance at his last visit in June 2019, his blood sugar had improved. (R.

at 338.) Cantrell reported he had cut out sweets and was exercising three to four times weekly. (R. at 338.) His hypertension was deemed controlled. (R. at 338.) Cantrell endorsed diarrhea, but he denied trouble swallowing, pain with urination and blood in his urine, among other things. (R. at 339.) His blood pressure was 140/88. (R. at 339.) A physical examination was completely normal, including normal range of motion of the neck, as well as normal range of musculoskeletal motion and no musculoskeletal edema. (R. at 339-40.) Dr. Landore continued to diagnose diabetes and hypertension, and she continued Cantrell on medications and ordered lab work. (R. at 340.) When Cantrell returned on September 16, 2019, seeking to have disability paperwork completed, he saw Dr. Patricia Radich, D.O. (R. at 335.) Cantrell alleged disability due to excessive problems with urine leakage with strenuous activity and change in position, as well as constant fatigue, both side effects of his cancer treatment. (R. at 335.) He noted these problems greatly impacted his work as a restaurant manager. (R. at 335.) Cantrell had no other complaints or concerns. (R. at 335.) He denied diarrhea, trouble swallowing and back pain, among other things. (R. at 335-37.) His blood pressure was 144/78. (R. at 337.) Physical examination was completely normal, including normal range of motion of the neck, normal bowel sounds, no musculoskeletal edema and normal musculoskeletal range of motion. (R. at 337.)

On September 16, 2019, Dr. Radich completed an Assessment Of Ability To Do Work-Related Activities (Physical), opining Cantrell could lift/carry 50 pounds occasionally and 25 pounds frequently, noting that urine leakage was exacerbated by carrying heavy objects, and he became easily fatigued from cancer treatment side effects. (R. at 591-93.) She opined he could stand/walk a total of three hours in an eight-hour workday, and he could stand for three hours without interruption, noting that standing/walking exacerbated Cantrell's urine leakage, and he became easily

-14-

fatigued from his cancer treatment side effects. (R. at 591.) Dr. Radich opined his ability to sit was not affected by his impairment. (R. at 592.) She opined he could frequently stoop and kneel; occasionally balance and crouch; and never climb and crawl, noting he was physically able to do these things, but positioning worsened his urine leakage. (R. at 592.) Dr. Radich opined Cantrell's ability to reach, to handle and to push/pull were affected by his impairment, again noting he could physically perform them, but he could not do them for long, as positioning and straining caused urine leakage. (R. at 592.) She opined Cantrell could not work around temperature extremes, noting that rising temperatures worsened his urine leakage. (R. at 593.) Dr. Radich explained that rising temperatures put exacerbation on the kidneys/bladder, and she noted Cantrell became fatigued in the high temperatures of a kitchen environment. (R. at 593.) Lastly, she opined his impairment would cause him to be absent from work more than two days monthly. (R. at 593.)

On October 18, 2019, Dr. Bert Spetzler, M.D., a state agency physician, completed a Physical Residual Functional Capacity assessment, in connection with the reconsideration of Cantrell's claim. (R. at 73-74.) His findings mirrored those of Dr. Camden, except he noted his findings with regard to Cantrell's ability to lift/carry, stand/walk, sit, push/pull and perform postural activities, were based on Cantrell's herniated disc in addition to his history of prostate cancer. (R. at 73-74.) Dr. Spetzler also provided an "RFC Additional Explanation," which explained that Cantrell's PSA continued to be zero three years out of treatment, as of February 27, 2019; scans were negative for metastasis or recurrence; despite Cantrell's report of a number of residual ailments due to treatment, he continued to operate his business for three years; his physical examinations were consistently normal for the prior year, including the one performed by the consultative examiner; and there were no listing level lab results or weight loss for a sustained period. (R. at 74.)

-15-

Cantrell saw Dr. Nida and Dr. Manju N. Pushkas, M.D., a resident, on December 16, 2019, for a routine follow up, reporting he had returned to taking his leftover glipizide because Medicare would not pay for Jardiance. (R. at 448.) He reported his blood sugars were usually 160 to 200 in the morning and 130 to 140 during the day. (R. at 448.) Cantrell said he had not seen a difference in his levels after switching from glipizide to Jardiance or vice versa. (R. at 448.) He also advised Dr. Nida Lipitor was causing aches. (R. at 448.) Cantrell's most recent A1C was 7.4 in September 2019. (R. at 448.) Dr. Pushkas noted Cantrell's PSA level was normal, as was his blood pressure at 128/74. (R. at 448, 451.) In a Review of Symptoms, Cantrell denied fatigue, diarrhea, urgency, neck pain and numbness, among other things, but he endorsed frequency. (R. at 451.) A physical examination was completely normal, including a normal range of motion of the neck; normal bowel sounds; normal musculoskeletal range of motion with no tenderness, deformity or edema; and normal muscle tone. (R. at 451-52.) Dr. Pushkas diagnosed hypertension; diabetes without complication; and gastroesophageal reflux disease, ("GERD"), without esophagitis. (R. at 452.) Dr. Pushkas continued Cantrell on medications, noting his blood sugar levels were not getting close to an acceptable range. (R. at 452.) Dr. Pushkas initiated Janumet and the generic version of Jardiance, noting if Medicare would not cover it or if Cantrell's blood sugar did not improve in a month, a small dose of insulin would be considered. (R. at 452.) When Cantrell returned on February 10, 2020, he reported to Dr. Nida and Dr. Radich that the medications were still too expensive, so he had returned to taking metformin and glipizide; however, he stated his blood sugar levels had not changed. (R. at 443.) He denied numbness or tingling of his hands. (R. at 443.) Cantrell was open to starting insulin, but he was concerned about hypoglycemia. (R. at 443.) He reported starting an exercise program with his wife three times weekly. (R. at 443.) Cantrell had no other health complaints or concerns. (R. at 443.) In a Review of Symptoms, he

denied fatigue, diarrhea, difficulty urinating, urgency, neck pain and numbness, among other things. (R. at 445.) Cantrell's blood pressure was 130/80. (R. at 445.) A physical examination, again, was completely normal, including normal range of motion of the neck; normal bowel sounds; and normal musculoskeletal range of motion without edema. (R. at 445-46.) Dr. Radich instructed Cantrell to stop taking glipizide, continue metformin and begin insulin. (R. at 446.) He also continued Cantrell's blood pressure medications and ordered labs. (R. at 446.)

On May 11, 2020, Cantrell saw Dr. Nida and Dr. Mary J. Allen, D.O., a resident, for a follow up on his diabetes and for completion of a disability form. (R. at 438.) He reported having hypoglycemia episodes typically around lunch time, with blood sugar levels from 90 to 110, but overall blood sugar levels from 140 to 180. (R. at 438.) Cantrell stated he exercised three to four times weekly with strength training and cardio. (R. at 38.) Dr. Allen found Cantrell's hypertension was uncontrolled, with only mild improvement with his current treatment. (R. at 438.) Cantrell reported home checks ranging from 140-150/60-70. (R. at 438.) On a Review of Symptoms, Cantrell endorsed diarrhea, as well as weakness with the hypoglycemic episodes. (R. at 439.) His blood pressure was 140/60. (R. at 439.) A physical examination was completely normal, including normal range of motion of the neck; normal bowel sounds; normal musculoskeletal range of motion with no edema; and intact sensation. (R. at 440.) Dr. Allen noted Cantrell's blood pressure goal was below 130/80, and she added Diovan-HCT, in addition to Norvasc. (R. at 441.) She also noted she would consider screening Cantrell for obstructive sleep apnea if he continued to have elevated blood pressure. (R. at 441.) Dr. Allen changed Cantrell's insulin from morning to night, and she continued him on metformin. (R. at 441.) She also advised him to check his blood sugar level with nighttime awakenings. (R. at 441.) Dr. Allen ordered PSA testing. (R. at 441.) When Cantrell

returned on June 3, 2020, he saw Dr. Nida and Dr. Radich for a follow up on his hypertension, and he requested completion of a disability form. (R. at 434.) He reported his blood pressure had improved since adding Diovan the previous month in conjunction with Coreg and Norvasc, and his blood pressure that day was 130/72. (R. at 434, 436.) Cantrell reported he had been feeling well, and Dr. Radich found his hypertension was controlled. (R. at 434.) In a Review of Symptoms, Cantrell denied fatigue, diarrhea, difficulty urinating, urgency and neck pain. (R. at 435-36.) A physical examination was, again, completely normal, including normal range of neck motion; normal bowel sounds; and normal musculoskeletal range of motion with no edema. (R. at 436.) Dr. Allen continued Cantrell's medications. (R. at 437.)

Cantrell returned to Dr. Littlejohn on July 8, 2020, for a routine follow up. (R. at 462.) At that time, he reported he could void satisfactorily, and he had no new complaints. (R. at 462.) Dr. Littlejohn had not received Cantrell's most recent PSA results. (R. at 462.) Cantrell reported he never had the sensation of not emptying his bladder completely; half of the time, he had to urinate again less than two hours after finishing urinating; less than half of the time, he had to stop and start again several times when urinating; he almost always found it difficult to postpone urination; half of the time, he had a weak urinary stream; and he never had to push or strain to begin urination. (R. at 462.) He reported having to get up three times during the night to urinate. (R. at 462.) On a Review of Symptoms, Cantrell continued to report hot flashes and night sweats; numbness and tingling; diarrhea; trouble swallowing; and high blood pressure, but he denied fatigue; back pain; and hearing problems. (R. at 463-64.) Cantrell's blood pressure was 146/80. (R. at 464.) Dr. Littlejohn diagnosed Cantrell with nocturia, which was stable, and he instructed him to return in one year. (R. at 464.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Cantrell argues the ALJ improperly determined his residual functional capacity and, therefore, erred by finding he could perform his past relevant work. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, he argues the ALJ improperly determined his residual functional capacity by rejecting the opinions of Drs. Abbott and Radich, as well as those of the state agency physicians. (Plaintiff's Brief at 5.)

Cantrell filed his application in May 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[5] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he

---

[5] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[6] *See* 20 C.F.R. § 404.1520c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found that, through the date last insured, Cantrell had the residual functional capacity to perform medium work, except he could have no exposure to unprotected heights and only occasional exposure to vibrations. (R. at 23.) In making his residual functional capacity finding, the ALJ found Dr. Abbott's July 2019 opinion that Cantrell likely could not walk and/or stand for a full workday, but that he may be able to sit for a

---

[6] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

partial workday with allotted, occasional breaks every 30 minutes; that he was limited to lifting less than five pounds to avoid uncontrollable urination; and that he should refrain from excessive bending, stooping and crouching, was unpersuasive. (R. at 26, 329.) In particular, the ALJ found this opinion "inconsistent" with Dr. Abbott's own findings, noting that, although her examination of Cantrell did not yield a great deal of abnormal findings, she, nonetheless, imposed a great deal of limitations. (R. at 26.) The court first notes that, although the ALJ characterizes this as an analysis of the consistency factor, it is, in actuality, an analysis of the supportability factor. As explained above, to properly assess supportability, the ALJ must consider whether a medical source considered relevant "objective medical evidence and [presented] supporting explanations." *Todd A. v. Kijakazi*, 2021 WL 5348668, at *5 (E.D. Va. Nov. 16, 2021) (quoting 20 C.F.R. § 404.1520c(c)(1)). Nonetheless, although the ALJ might have mislabeled his analysis, the court finds that the ALJ performed a proper supportability analysis of Dr. Abbott's opinion, in essence, finding that it was not supported by her own findings. In particular, the record shows that, despite the harsh limitations she imposed on Cantrell, Dr. Abbott's examination of him yielded completely normal findings. Specifically, among other things, Cantrell had no neck tenderness and strong neck movement against resistance; strong shoulder shrug; normal gait; full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; good muscle tone and full strength in all muscle groups, bilaterally; intact sensation throughout; no muscle asymmetry, atrophy or involuntary movements; negative straight leg raise testing; and normal range of motion in all joints tested, including the cervical spine and shoulders. (R. at 328-30.)

However, as stated herein, the ALJ also is required to address the consistency factor. At the very least, he must articulate whether an opinion is consistent with the

other evidence in the record. *See Allison E.B. v. Kijakazi*, 2022 WL 955013, at \*7 (E.D. Va. Jan. 31, 2022) (citing 20 C.F.R. § 404.1520c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions … in your determination or decision), *report and recommendation adopted*, *Boyd v. Kijakazi*, 2022 WL 949904 (E.D. Va. Mar. 29, 2022). "The Court may not 'fill in the blanks for the ALJ[,]' nor may the Court '[h]armoniz[e] conflicting evidence,' or 'bolster[] inconclusive findings' as these activities fall outside the scope of review." *Tanzi F. v. Saul*, 2021 WL 3205050, at \*8 (E.D. Va. July 8, 2021) (quoting *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662-63 (4th Cir. 2017)), *report and recommendation adopted*, 2021 WL 3192162 (E.D. Va. July 28, 2021). Here, the ALJ's evaluation of Dr. Abbott's opinion is devoid of any explanation whether he considered the consistency factor in evaluating the persuasiveness of Dr. Abbott's opinion, and, if so, whether he found it was consistent or inconsistent with the record. This failure to articulate the consistency factor in his evaluation of Dr. Abbott's opinion constitutes error. *See* 20 C.F.R. § 404.1520c(b)(2). This court cannot "fill in the blanks for the ALJ" by finding substantial evidence supports the ALJ's evaluation of Dr. Abbott's opinion when the ALJ did not even address the consistency factor, nor may the court "bolster[] inconclusive findings" when the ALJ did not discuss the extent to which Dr. Abbott's opinion was either consistent or inconsistent with the evidence in the record. *See Patterson*, 846 F.3d at 662. Absent any explanation by the ALJ whether Dr. Abbott's opinion was consistent or inconsistent with the record, this court cannot meaningfully review how the ALJ evaluated the persuasiveness of Dr. Abbott's opinion and whether substantial evidence supports the ALJ's determination.

Next, with regard to Dr. Radich's September 2019 opinion – that Cantrell could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk for

three hours total and without interruption in an eight-hour workday; sit without limitation; never climb or crawl; occasionally crouch and balance; frequently stoop and kneel; he would have limitations in reaching, handling, pushing and pulling; he should avoid temperature extremes; and he would miss more than two workdays monthly – the ALJ found it partially persuasive. (R. at 26, 591-93.) Specifically, the ALJ found persuasive her opinion regarding Cantrell's lifting abilities. (R. at 26.) However, he stated that, "the remainder of the opinion does not appear to be supported by the overall evidence suggesting ongoing functioning without significant limitations." (R. at 26.) To support this statement, the ALJ simply cites to the exhibits containing the treatment notes from Wellmont Medical Associates from December 6, 2019, and those from Dr. Littlejohn from June 3, 2019, to July 8, 2020. (R. at 26, 434-53, 462-73.) The notes from Wellmont Medical Associates, which include two notes from Dr. Radich, show that, although Cantrell had some issues with elevated blood sugar levels and some elevated blood pressure readings, his physical examinations were completely normal. (R. at 434-53.) The treatment notes from Dr. Littlejohn show that, while Cantrell had complaints of hot flashes and night sweats, numbness and tingling, diarrhea and trouble swallowing, he voiced no new complaints. (R. at 462-73.) Cantrell denied urinary incontinence, an abnormal sensation when needing to urinate and a need to strain or bear down to start a urinary stream. (R. at 469.) Dr. Littlejohn noted that Cantrell's PSA level remained undetectable, and he stated Cantrell continued to do well. (R. at 469, 471.) By July 2020, Cantrell continued to void satisfactorily, and he had no new complaints. (R. at 462.)

While the language used here by the ALJ in evaluating the persuasiveness of Dr. Radich's opinion would, at first glance, seem to indicate he was addressing only the supportability of the opinion, the ALJ states it does not appear to be supported

by "the overall evidence," which suggests he is addressing the opinion's consistency. A review of the treatment notes to which the ALJ cites in support of this finding reveals notes from Dr. Littlejohn, Cantrell's urologist, as well as Dr. Nida and various residents, including Dr. Radich, herself. Thus, I find that the ALJ could, in fact, have addressed both the supportability and the consistency of Dr. Radich's opinion with this finding and with reference to these treatment notes. *See Woodson v. Berryhill*, 2018 WL 4659449, at *6 (E.D. Va. Aug. 7, 2018), *report and recommendation adopted*, 2018 WL 4658681 (E.D. Va. Sept. 27, 2018) (finding the ALJ need not use any particular language or adhere to a particular format in issuing his decision) (citation omitted); *see also Gassaway v. Colvin*, 2013 WL 2389894, at *6 (E.D. Va. May 28, 2013) ("There is no particular language or format that an ALJ must use in his … analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review.") (alteration in the original) (citations omitted). Thus, even under the new regulatory scheme, the ALJ need not necessarily use the words "supportability" or "consistency," as long as he performs the requisite analysis of these factors. In other words, although the ALJ is not required to follow any particular format in his opinion, whatever format the ALJ chooses must allow a reviewing court to discern an "accurate and logical bridge" from the record evidence to the ALJ's conclusion. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)); *see also* 82 Fed. Reg. 5844-01 at 5858 (the ALJ must comply with a "reasonable articulation standard," which enables "a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review [the ALJ's] final decision."). I find that, despite the brevity of the ALJ's analysis of Dr. Radich's opinion, the court can, nonetheless "trace the path" of his reasoning, and a meaningful review is not frustrated. I further find that the evidence cited to by the ALJ supports a finding

that Dr. Radich's opinion, with the exception of the lifting restrictions, is not supported by her own treatment notes which show completely normal physical examinations. I, likewise, find these treatment notes support a finding that Dr. Radich's opinion is not consistent with the other evidence of record, which also reflects completely normal physical examinations; denials of urinary incontinence, an abnormal sensation when needing to urinate and needing to strain to start a urinary stream; no new complaints to his urologist; a PSA level that remained undetectable; and a finding by his urologist that he continued to do well.

Lastly, with regard to the state agency physicians, who opined in August 2019 and October 2019, that Cantrell could perform light work, the ALJ found that, while Cantrell suffered from cervical disc disease, confirmed by objective imaging, the functional limitations resulting therefrom "were not documented in such a way to support reduction to a light functional capacity." (R. at 26.) He then proceeded to state, "In general, the claimant's examinations have provided minimal in the way of objective abnormalities to support the light residual functional capacity …." (R. at 26.) This is the entirety of the ALJ's evaluation of the state agency physicians' opinions. I find that this is not a sufficient analysis to allow the court to "trace the path" of the ALJ's reasoning regarding the supportability or the consistency of these opinions. The ALJ failed to build the requisite logical bridge between any discussion of the record evidence and the question whether these opinions were consistent with the evidence under the circumstances. Likewise, he failed to discuss either of these physician's explanations offered in support of their opinions. While it is true, as explained above, that the ALJ need not necessarily use the words "supportability" and "consistency" in his persuasiveness analysis, his evaluation must allow the court to make a meaningful review without having to fill in the gaps of his reasoning or

bolster an inadequate opinion. I find that the court would be doing both of these things with regard to the ALJ's analysis of the state agency physicians' opinions.

Based on all the above, I find substantial evidence does not exist to support the ALJ's consideration of the medical opinion evidence, as well as his residual functional capacity finding and ultimate disability finding for the period from March 11, 2019, to June 30, 2020.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding for the period from March 11, 2019, to June 30, 2020; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Cantrell was not disabled under the Act and was not entitled to DIB benefits for the period from March 11, 2019, to June 30, 2020.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cantrell's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Cantrell's claim to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

       Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

       The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

       DATED:    August 12, 2022.

                 /s/ *Pamela Meade Sargent*
                 UNITED STATES MAGISTRATE JUDGE